IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:22-CV-144-D

VICTORIA NORRIS,                        )
                                        )
                    Plaintiff,          )
                                        )
            v.                          )          **ORDER**
                                        )
FAT BURGERS SPORTS BAR & GRILL,         )
and WILLIAM UZZELL, III,                )
                                        )
                    Defendants.         )

On August 13, 2022, Victoria Norris ("Norris" or "plaintiff") filed a complaint against Fat

Burgers Sports Bar & Grill, LLC ("Fat Burgers") and William Uzzell, III ("Uzzell") (collectively

"defendants"). Norris alleges (1) a hostile work environment, sex discrimination, and retaliation

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq.

against Fat Burgers (count one), (2) intentional infliction of emotional distress ("IIED") against

defendants (count two), (3) failure to pay overtime and retaliation in violation of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq. against defendants (count three), and (4) failure

to pay wages in violation of the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat.

§§ 95-25.1 et seq. against defendants (count four) [D.E. 1]. On December 14, 2023, defendants

moved for summary judgment [D.E. 54] and filed a memorandum of law [D.E. 55], a statement of

material facts [D.E. 56], and an appendix of exhibits [D.E. 57] in support. On January 4, 2024,

Norris responded in opposition [D.E. 60] and filed a response statement of material facts [D.E. 58]

and an appendix of exhibits [D.E. 59]. On January 18, 2024, defendants replied [D.E. 61] and

filed a reply statement of material facts [D.E. 62]. As explained below, the court grants in part

and denies in part defendants' motion for summary judgment.

## I.

Fat Burgers is a hamburger and "bar food" restaurant in Sneads Ferry, North Carolina. See Defs.' Statement of Material Facts ("DSMF") [D.E. 56] ¶¶ 1–2; Pl.'s Response Statement of Material Facts ("PRSMF") [D.E. 58] ¶¶ 1–2. In May 2016, Norris began working as a server at Fat Burgers. See DSMF ¶ 3; PRSMF ¶ 3. When Norris was a server, Fat Burgers paid her $2.35 per hour plus tips. See DSMF ¶ 6; PRSMF ¶ 6.

In May 2016, Uzzell owned Fat Burgers. See DSMF ¶ 4; PRSMF ¶ 4. Later in 2016, Norris and Uzzell began a romantic relationship. See DSMF ¶ 4; PRSMF ¶ 4. Norris moved in with Uzzell, and they lived together in Uzzell's residence for approximately three years. Compare DSMF ¶ 5, with PRSMF ¶ 5. In late 2019, Norris and Uzzell ended their romantic relationship, and Norris moved out of Uzzell's residence. See DSMF ¶ 20; PRSMF ¶ 20.

After Norris and Uzzell ended their romantic relationship, Uzzell repeatedly called Norris at Fat Burgers various names including, "liar," "gold-digging whore," "bitch," and "gold digger." Compare Compl. [D.E. 1] ¶ 26, with Defs.' Reply Statement of Material Facts ("DRSMF") [D.E. 62] ¶ 11. Uzzell also repeatedly berated Norris at work, once entered Fat Burgers' women's restroom while Norris was using the restroom to berate her, and placed an electronic tracking device on Norris's car. See [D.E. 57-1] 18; [D.E. 57-13] 17–18; [D.E. 57-14] 1; [D.E. 57-15] 7. Uzzell also berated Norris outside Fat Burgers and once refused to let her return inside the restaurant while they conversed. See [D.E. 57-1] 37.

While Fat Burgers employed Norris, Norris received consistent promotions and pay raises. Compare DSMF ¶ 7, with PRSMF ¶ 7; see also DSMF ¶¶ 12–16; PRSMF ¶¶ 12–16. From 2018 until today, Norris has been the front store manager at Fat Burgers. See [D.E. 57-1] 4; DSMF ¶

2

10; PRSMF ¶ 10. Norris's managerial duties include training staff, managing customer service and complaints, organizing employees' schedules, tracking employees' hours, ordering food and other restaurant supplies, supervising daily shift operations, coordinating front of house operations, and assisting waitstaff. Compare DSMF ¶ 11, with PRSMF ¶ 11. Beginning in 2020, Fat Burgers agreed to pay Norris a percentage of Fat Burgers' annual profits. Compare DSMF ¶¶ 15–17, with PRSMF ¶¶ 15–17.

In April 2021, Uzzell began the process of selling Fat Burgers to Taylor Greene ("Greene"), and Greene began serving as Fat Burgers' operations manager. See DSMF ¶ 21; PRSMF ¶ 21; [D.E. 57-4] 10. Beginning in April 2021, Greene began supervising Norris and other Fat Burgers employees. See DSMF ¶ 21; PRSMF ¶ 21; [D.E. 57-4] 9–10. In May 2021, Greene told Norris she could not receive tips because she was a manager. See [D.E. 57-4] 22; compare DSMF ¶ 23, with PRSMF ¶ 23; cf. 29 C.F.R. § 531.54(b).[1] At that time, Norris began turning over her tips to Fat Burgers' bookkeeper, Dawn Potter ("Potter"). See [D.E. 57-4] 22; compare DSMF ¶ 24, with PRSMF ¶ 24. Norris estimates that she earned $200 to $300 per week in tips. See [D.E. 57-1] 9. Norris later complained to Potter about not getting tips. See [D.E. 57-4] 23. Potter told Uzzell about Norris's complaint, and Uzzell instructed Potter to pay Norris her tips. Id. Potter did so. Id.; [D.E. 57-2] 85.

On June 28, 2021, Norris filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex discrimination and retaliation under Title VII. See DSMF ¶ 29; PRSMF ¶ 29; [D.E. 57-8]. On November 22, 2021, Norris filed a retaliatory employment discrimination complaint with the North Carolina Department of Labor ("NC DOL")

---

[1] Ultimately, Uzzell did not sell Fat Burgers to Greene. See [D.E. 57-4] 21. In August 2022, Greene stopped working for Fat Burgers. See id. at 11. Green and Uzzell are in separate litigation about the attempted sale. See id. at 7; [D.E. 57-2] 91, 96.

alleging Fat Burgers reduced her pay when it changed the tip structure. See DSMF ¶ 35; PRSMF ¶ 35.

On February 18, 2022, Norris filed an addendum to her retaliatory employment discrimination complaint. See DSMF ¶ 37; PRSMF ¶ 37. On March 24, 2022, Norris filed an amended EEOC charge alleging retaliation and sex discrimination under Title VII. See DSMF ¶¶ 29, 38; PRSMF ¶¶ 29, 38. On May 15, 2022, the EEOC issued Norris a right to sue letter. See DSMF ¶ 39; PRSMF ¶ 39. On May 19, 2022, the NC DOL issued Norris a right to sue letter. See DSMF ¶ 40; PRSMF ¶ 40. On August 13, 2022, Norris filed this action.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378.

4

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

## III.

### A.

Norris alleges that Fat Burgers created a sexually hostile work environment in violation of Title VII. See Compl. ¶¶ 49–61. To survive summary judgment on this claim, Norris must forecast evidence from which a reasonable jury could find that (1) she experienced unwelcome conduct, (2) the conduct was based on her sex, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) the conduct is imputable to the employer. See, e.g., Laurent-Workman v. Wormuth, 54 F.4th 201, 210–12 (4th Cir. 2022); Chapman v. Oakland Living Ctr., Inc., 48 F.4th 222, 228–29 (4th Cir. 2022); Perkins v. Int'l Paper Co., 936 F.3d 196, 207–08 (4th Cir. 2019); Parker v. Reema Consulting Servs., Inc., 915 F.3d 297, 302 (4th Cir. 2019); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) (en banc); Okoli v. City of Balt., 648 F.3d 216, 220–21 (4th Cir. 2011); E.E.O.C. v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 327 (4th Cir. 2010); Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc); Fox v. Gen. Motors Corp., 247 F.3d 169, 175–76 (4th Cir. 2001); Coleman v. Altec, Inc., No. 5:16-CV-954, 2018 WL 4289610, at *3 (E.D.N.C. Sept. 7, 2018) (unpublished); Brown v. Wake Cnty. Gov't,

5

No. 5:16-CV-806, 2017 WL 2982971, at *5 (E.D.N.C. July 12, 2017) (unpublished). Norris also must show that her protected characteristic was the "but for" cause of the alleged harassment. See, e.g., Gilliam v. S.C. Dep't of Juv. Just., 474 F.3d 134, 142 (4th Cir. 2007).

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment and create an abusive working environment based on a protected characteristic, the court examines the allegations both subjectively and objectively. See, e.g., Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). First, the employee must subjectively consider the conduct to be sufficiently severe or pervasive as to alter her conditions of employment. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam); Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998); Boyer-Liberto, 786 F.3d at 277. Second, a court views the conduct from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive. See, e.g., Breeden, 532 U.S. at 271; Faragher, 524 U.S. at 787–88; Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998); Boyer-Liberto, 786 F.3d at 277.

In doing so, the court considers all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23; see Parker, 915 F.3d at 304. The conduct must be severe or pervasive to be actionable. See Harris, 510 U.S. at 23; Faragher, 524 U.S. at 787–88; Boyer-Liberto, 786 F.3d at 277–78. Title VII does not create "a general civility code for the American workplace." Oncale, 523 U.S. at 80; see Irani v. Palmetto Health, 767 F. App'x 399, 416 (4th Cir. 2019) (per curiam) (unpublished). Rather, the "conduct must . . . amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788; see Boyer-Liberto, 786 F.3d at 277–

6

81. Simple teasing, sporadic rude language, offhand comments, jokes related to a protected status, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68–69 (2006); Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 788; cf. Chapman, 48 F.4th at 228–34; Boyer-Liberto, 786 F.3d at 277–81. Likewise, mere rude or insensitive treatment cannot sustain a hostile work environment claim. See, e.g., Baqir v. Principi, 434 F.3d 733, 746–47 (4th Cir. 2006), abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–80; see also Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; cf. Chapman, 48 F.4th at 228–34; Boyer-Liberto, 786 F.3d at 277–81; Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 207–10 (4th Cir. 2014); Freeman v. Dal-Tile Corp., 750 F.3d 413, 420–24 (4th Cir. 2014); Okoli, 648 F.3d at 220–22.

Initially, Fat Burgers contends that because Norris filed her EEOC charge on June 28, 2021, then all alleged events that occurred before December 28, 2020, concerning her sexually hostile work environment claim are time barred. See [D.E. 55] 16–17. Title VII requires a plaintiff to file her EEOC charge within 180 days of each alleged adverse employment action. See, e.g., 42 U.S.C. §§ 2000e-5(e)(1), (f)(1); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109–15 (2002); Williams v. Giant Food, Inc., 370 F.3d 423, 428 (4th Cir. 2004); Donald v. Novant Health, Inc., 689 F. Supp. 3d 170, 176 (E.D.N.C. 2023); Coleman, 2018 WL 4289610, at *2; Young v. Onslow Water & Sewer Auth., No. 7:16-CV-259, 2018 WL 405975, at *4 (E.D.N.C. Jan. 12, 2018) (unpublished); Barcliff v. N.C. League of Muns., No. 5:10-CV-244, 2011 WL 3290578, at *2 (E.D.N.C. Aug. 1, 2011) (unpublished); Bratcher v. Pharm. Prods. Dev., Inc., 545 F. Supp. 2d 533, 539 (E.D.N.C. 2008); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 606 n.3 (E.D.N.C. 2006). If a party fails to timely file an EEOC charge, the party "lose[s] the

Case 7:22-cv-00144-D-BM    Document 63    Filed 09/13/24    Page 7 of 32

ability to recover for" that claim because the claim is not "actionable." Morgan, 536 U.S. at 110,
113. Moreover, only adverse employment actions "that took place within the timely filing period
are actionable." Id. at 114; see Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 623–24
(2007) superseded by statute on other grounds, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No.
111-2, 123 Stat. 5; Williams, 370 F.3d at 428; Coleman, 2018 WL 4289610, at *2; Young, 2018
WL 405975, at *4; Barcliff, 2011 WL 3290578, at *4; McDougal-Wilson, 427 F. Supp. 2d 595,
606 n.3.

Here, for discrete acts of sex discrimination, only those discrete acts of sex discrimination
that occurred on or after December 28, 2020, are actionable. See, e.g., Morgan, 536 U.S. at 109–
15. With respect to Norris's sexually hostile work environment claim, however, a different rule
applies. So long as one act encompassing the sexually hostile work environment claim occurred
within the 180-day period and the acts beyond the 180-day period are components acts of a single
sexually hostile work environment claim, a court may consider those acts outside the 180-day
window as part of a single sexually hostile work environment claim. See, e.g., Morgan, 536 U.S.
at 120; McDougal-Wilson, 427 F. Supp. 2d at 616. Viewing the record in the light most favorable
to Norris, the court rejects Fat Burgers' argument that Norris's sexually hostile work environment
claim is limited to events that occurred on or after December 28, 2020. See, e.g., [D.E. 57-4] 3–
7, 10–11, 16, 19.

Next, Fat Burgers contends that Title VII does not cover "disagreements and relationship
strife between paramours." [D.E. 61] 8; see id. at 8–10. In support, Fat Burgers cites cases where
courts have "expressly held that a supervisor's preferential treatment of a paramour on the basis
of a sexual relationship that is consensual is not discrimination based on sex." Ahern v. Omincare
ESC LLC, No. 5:08-CV-291, 2009 WL 2591320, at *5 (E.D.N.C. Aug. 19, 2009) (unpublished);

see, e.g., Becerra v. Dalton, 94 F.3d 145, 149–50 (4th Cir. 1996); Mundy v. Palmetto Ford, Inc., 998 F.2d 1010, 1993 WL 280340, at *2 (4th Cir. July 27, 1993) (unpublished table decision); Doyle v. Advanced Fraud Sols., LLC, No. 1:18CV885, 2020 WL 1305162, at *8–9 (M.D.N.C. Mar. 19, 2020) (unpublished); Murray v. City of Winston-Salem, 203 F. Supp. 2d 493, 501–02 (M.D.N.C. 2002). Fat Burgers contends that under these cases, "it follows" that if "paramour preference is not sex discrimination as a matter of law, . . . [then] the withdrawal of paramour preference, too, cannot be sex discrimination as a matter of law." [D.E. 55] 25.

The court rejects Fat Burgers' argument. The cited cases address the viability of a Title VII claim of a paramour's coworker seeking a remedy for favoritism an employer provides to a paramour. The cited cases do not address the viability of a Title VII claim of a paramour or ex-paramour. Moreover, an ex-paramour can assert a sexually hostile work environment claim or a sex discrimination claim provided that the employer's alleged conduct is based on the ex-paramour's sex. See, e.g., Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229–30 (1st Cir. 2007); Green v. Adm'rs of Tulane Educ. Fund, 284 F.3d 642, 656–57 (5th Cir. 2002), overruled on other grounds by White, 548 U.S. 53 (2006); Ford v. Simms, 23 F. App'x 152, 153–54 (4th Cir. 2001) (per curiam) (unpublished); Succar v. Dade Cnty. Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000 (per curiam) (unpublished); Nixon v. Kysela Pere et Fils, LTD., No. 5:21-cv-11, 2022 WL 819562, at *10–11 (W.D. Va. Mar. 17, 2022) (unpublished) vacated and remanded on other grounds, No. 22-1406, 2024 WL 3666166 (4th Cir. Aug. 6, 2024) (unpublished); Dole v. Town of Bethlehem, No. 1:16-CV-173, 2017 WL 1483451, at *6–7 (N.D.N.Y. Apr. 25, 2017) (unpublished). Thus, Norris's status as Uzzell's ex-paramour does not entitle Fat Burgers to summary judgment on Norris's sexually hostile work environment claim under Title VII "as a matter of law." [D.E. 55] 25.

9

In support of her sexually hostile work environment claim, Norris testified that Uzzell regularly berated her at work, once broke into Fat Burgers' women's restroom to confront her while Norris was using the restroom, repeatedly called Norris names at work including "whore," "bitch," "gold-digging whore," and "liar," once berated her outside Fat Burgers and then did not let her back inside, put an electronic tracker on Norris's car, and yelled and swore at her. See Compl. ¶ 26; [D.E. 57-1] 6–9, 12–18, 29–31, 37; [D.E. 57-13] 15–18. Other witnesses who worked at Fat Burgers corroborated some of these allegations. See [D.E. 57-4] 3–16; [D.E. 57-14] 1; [D.E. 57-15] 3–22; cf. [D.E. 57-2] 21–30, 36. Norris admits that Uzzell's alleged sexual harassment did not begin until after she moved out of his residence in 2019 and Uzzell suspected Norris had begun a romantic relationship with another man. See [D.E. 57-1] 6, 14–15.

Viewing the record in the light most favorable to Norris, genuine issues of material fact exist concerning Norris's sexually hostile work environment claim under Title VII. See, e.g., Breeden, 532 U.S. at 270–71; Faragher, 524 U.S. at 787–88; Oncale, 523 U.S. at 81–82; Chapman, 48 F.4th at 228–34; Boyer-Liberto, 786 F.3d at 277–81; Walker, 775 F.3d at 207–10; Freeman, 750 F.3d at 420–24; Okoli, 648 F.3d at 220–22; Forrest, 511 F.3d at 229–30. Thus, the court denies Fat Burgers' motion for summary judgment on Norris's sexually hostile work environment claim under Title VII.

### B.

Norris alleges that Fat Burgers discriminated against her based on her sex in violation of Title VII. See Compl. ¶¶ 49–61. In support, Norris alleges that (1) she did not receive her annual profit share in 2021 and 2022; (2) she did not receive a $1.00 per hour raise given to some male hourly employees; and (3) Fat Burgers put her on probation for a 10-day period that turned into a 60-day period from May 2021 to July 2021. See [D.E. 60] 6.

10

Norris lacks direct evidence of sex discrimination and relies on the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, Norris first must establish a prima facie case of sex discrimination by showing that (1) she is a member of a protected class; (2) she experienced an adverse employment action; (3) she was fulfilling her employer's legitimate expectations at the time of her adverse employment action; and (4) the adverse employment action arose under circumstances permitting a reasonable inference of sex discrimination. See, e.g., McDonnell Douglas Corp., 411 U.S. at 807; Sempowich v. Tactile Sys. Tech. Corp., 19 F.4th 643, 649–50 (4th Cir. 2021); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013); Miles v. Dell, Inc., 429 F.3d 480, 485–89 (4th Cir. 2005). If Norris succeeds in proving her prima facie case, the burden shifts to Fat Burgers to articulate a legitimate, nondiscriminatory reason for Norris's adverse employment action. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–09 (1993); Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). If Fat Burgers carries this burden of production, Norris must demonstrate that a genuine issue of material fact exists concerning whether Fat Burgers' reason for Norris's adverse employment action was a pretext for sex discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Burdine, 450 U.S. at 253–56; Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006); Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006); Hill, 354 F.3d at 298; King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003).

Fat Burgers contends Norris fails to cite evidence that she suffered an adverse employment action because of her sex. See [D.E. 55] 19–21. An adverse employment action does not require a "'significant' . . . [o]r serious, or substantial, or any similar adjective suggesting that the

11

disadvantage to the employee must exceed a heightened bar" change in working conditions. Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024). Rather, it requires "some harm respecting an identifiable term or condition of employment." Id.; see Yates v. Spring Indep. Sch. Dist., ___ F.4th ___, 2024 WL 3928095, at *4 (5th Cir. Aug. 26, 2024); Stratton v. Bentley Univ., ___ F.4th ___, 2024 WL 3823034, at *6 n.6 (1st Cir. 2024); Peifer v. Bd. of Prob. & Parole, 106 F.4th 270, 277 (3d Cir. 2024); Rios v. Centerra Grp. LLC, 106 F.4th 101, 112 (1st Cir. 2024); Cole v. Grp. Health Plan, Inc., 105 F.4th 1110, 1114 (8th Cir. 2024); Milczak v. Gen. Motors, LLC, 102 F.4th 772, 787 (6th Cir. 2024), reh'g denied sub nom. Mllczak v. Gen. Motors, LLC, No. 23-1462, 2024 WL 3205990 (6th Cir. June 17, 2024) (unpublished). Moreover, to "discriminate against means [to] treat worse." Muldrow, 601 U.S. at 355 (quotation omitted). An employee need only be "treat[ed] worse" respecting an identifiable term, condition, or privilege of employment based on her protected status, such as sex. Id. Thus, an adverse employment action includes a "disadvantageous change to the compensation, terms, conditions, or privileges of employment because of a protected status." Cole, 105 F.4th at 1114; see Rios, 106 F.4th at 112.

In Muldrow, a female police sergeant filed a Tile VII sex discrimination claim and alleged that the St. Louis Police Department transferred her from one job as a sergeant to another job as a sergeant because she was a woman. See Muldrow, 601 U.S. at 350. Specifically, she alleged that the St. Louis Police Department transferred her from a plainclothes job in the Intelligence Division to a uniformed job in the Department's Fifth District because of her sex. Id. at 351. Although the sergeant's "rank and pay remained the same in the new position, her responsibilities, perks, and schedule did not." Id. With respect to the requirement of an adverse employment action, the Supreme Court held that a Title VII plaintiff alleging a sexually discriminatory transfer had to show "that the transfer brought about some 'disadvantageous' change in an employment term or

12

condition." Id. at 354 (quoting Oncale, 523 U.S. at 80). The Supreme Court explained that the phrase "terms, conditions, or privileges of employment" used in Title VII "is not used in the narrow contractual sense; it covers more than the economic or tangible." Id. (quotations omitted). Nonetheless, "[t]o make out a Title VII discrimination claim, a [claimant] must show some harm respecting an identifiable term or condition of employment." Id. at 354–55.

As for Norris's sex discrimination claim about her failure to receive her annual profit share in 2021 or 2022, Fat Burgers agreed that beginning on 2020, she would receive 20% of Fat Burgers' annual profit. See [D.E. 57-1] 4; see also [D.E. 57-2] 37–38. Norris did not receive her 2020 profit share immediately at the end of 2020. See [D.E. 57-1] 26–27. Fat Burgers delayed filing its 2020 taxes, and defendants told Norris that the delay stalled payment of her annual 2020 profit share. See id.; [D.E. 57-4] 22; [D.E. 57-9] 2. On September 10, 2021, Fat Burgers provided Norris a check in the amount of $12,654.60 for her annual 2020 profit share. See [D.E. 57-10]; see also [D.E. 57-4] 22.

In 2021 and 2022, Fat Burgers did not make a profit. See [D.E. 57-2] 37–38, 77, 83; [D.E. 57-4] 14, 21; [D.E. 57-18] 1–4, 12, 30–32, 38, 40, 41, 44, 50–53. Accordingly, there was no profit to share with Norris in 2021 or 2022. Thus, Norris received all profits that defendants owed her from 2020 to 2022, and Norris's sex discrimination claim concerning the annual profit share in 2021 and 2022 fails.

In opposition to this conclusion, Norris argues that "there is a question of fact whether Fat Burgers indeed did not make a profit in 2021 or 2022" because while gross receipts were higher in those years than in 2020, costs "skyrocketed." [D.E. 60] 2. According to Norris, "[a]t the very least, this evidence raises a question of fact as to whether [Norris] was paid the true profits from the business." Id. at 3.

13

Norris forecasts no evidence that defendants improperly or incorrectly calculated Fat Burgers' profits. See [D.E. 57-1] 25, 40. For example, Norris has no expert witness who responds to Fat Burgers' evidence concerning how it calculated its lack of profits in 2021 or 2022. Rather, Norris merely speculates that Fat Burgers' losses in 2021 and 2022 are suspicious and not "true." See [D.E. 60] 2–3; [D.E. 57-1] 25, 40.

Norris "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale, 769 F.2d at 214; see also Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing particular parts of materials in the record . . . ."). Thus, this claim fails.

As for the alleged $1.00 per hour increase allegedly given to some hourly male employees, Norris testified that she heard that hourly male employees got an extra $1.00 per hour if they showed up for work on time. See [D.E. 57-1] 31–32. Norris provides no time frame for this alleged pay discrepancy and has failed to show that it occurred after December 28, 2020. See id. Thus, the claim is untimely. See, e.g., Morgan, 536 U.S. at 109–15.

Alternatively, Norris cannot rely on hearsay to create a genuine issue of material fact. See Beale, 769 F.2d at 214; Fed. R. Civ. P. 56(c)(1)(A). Thus, this claim fails.

As for Norris's sex discrimination claim about the probationary period, Norris alleges that Fat Burgers placed her on probation for a 10-day period beginning at the end of May 2021 and extended it to the end of July 2021. See [D.E. 57-1] 11–12, 19–20. The probation arose because Fat Burgers was not satisfied with how Norris trained new employees. See id. During the probationary period, Norris did not receive tips. See id. at 19.

The court assumes without deciding that Norris's failure to receive tips during the probationary period qualifies as an adverse employment action. Muldrow, 601 U.S. at 354–55.

14

As for the balance of Norris's prima facie case, Norris must create a genuine issue of material fact that she was fulfilling her employer's legitimate expectations when Fat Burgers placed her on probation and that the adverse employment action arose under circumstances permitting a reasonable inference of sex discrimination. See, e.g., McDonnell Douglas Corp., 411 U.S. at 807; Sempowich, 19 F.4th 649–50; Hill, 354 F.3d at 285; Miles, 429 F.3d at 485–89. In Norris's opinion, she properly trained the new employees. See [D.E. 57-1] 11–12. Norris's opinion of her own performance, however, does not control. See, e.g., King, 328 F.3d at 149; Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000); Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); Kariuki v. Dep't of Ins., No. 5:18-CV-341, 2021 WL 3781879, at *4 (E.D.N.C. Aug. 25, 2021) (unpublished), appeal dismissed sub nom. Kariuki v. N.C. Dep't of Ins., No. 21-2068, 2022 WL 17412872 (4th Cir. 2022) (per curiam) (unpublished). It is Fat Burgers' opinion that controls, and Fat Burgers believed that Norris deficiently trained new employees. See [D.E. 57-2] 33. Thus, the claim fails.

Alternatively, Norris has failed to demonstrate that Fat Burgers imposed the probationary period under circumstances permitting a reasonable inference of sex discrimination. For example, Norris cites no similarly situated male manager who Fat Burgers treated differently. Thus, Norris's Title VII sex discrimination claim fails. See, e.g., Cosby v. S.C. Prob., Parole & Pardon Servs., 93 F.4th 707, 714–16 (4th Cir. 2024); Haynes v. Waste Connections, Inc., 922 F.3d 219, 223–24 (4th Cir. 2019); Spencer v. Va. State Univ., 919 F.3d 199, 207–08 (4th Cir. 2019); Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008). Accordingly, the court grants summary judgment to Fat Burgers on Norris's Title VII sex discrimination claim concerning profit sharing, the $1.00 per hour extra pay, and the 60-day probationary period. See, e.g., Cosby, 93 F.4th at 714–16; Haynes, 922 F.3d at 219; Spencer, 919 F.3d at 207–08; Lightner, 545 F.3d at 265; Johnson

15

v. Floyd, No. 3:19-cv-521, 2020 WL 2520171, at *7 & n.10 (E.D. Va. May 18, 2020) (unpublished); Dean v. Philip Morris USA Inc., No. 1:02CV149, 2003 WL 21754998, at *6–7 (M.D.N.C. July 29, 2003) (unpublished).

## C.

Norris alleges Fat Burgers retaliated against her in violation of Title VII when Fat Burgers failed to provide Norris her annual profit share in 2021 and 2022. See [D.E. 60] 13. Norris lacks direct evidence of retaliation and proceeds under the McDonnell Douglas burden-shifting framework.

To establish a prima facie case of retaliation, Norris must prove that (1) she engaged in protected activity under Title VII, (2) her employer took some action against her that a reasonable employee would find materially adverse, and (3) her employer took the adverse action because of the protected activity. See Barbour v. Garland, 105 F.4th 579, 590 (4th Cir. 2024); Massaro v. Fairfax Cnty., 95 F.4th 895, 902 (4th Cir. 2024); Cosby, 93 F.4th at 718; McIver v. Bridgestone Ams., Inc., 42 F.4th 398, 411 (4th Cir. 2022); Walton v. Harker, 33 F.4th 165, 177 (4th Cir. 2022); Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021); Sempowich, 19 F.4th at 653; Kitlinski v. U.S. Dep't of Justice, 994 F.3d 224, 232 (4th Cir. 2021); Wilcox v. Lyons, 970 F.3d 452, 460 (4th Cir. 2020); Int'l Paper Co., 936 F.3d at 213; Savage v. Maryland, 896 F.3d 260, 276 (4th Cir. 2018); Strothers v. City of Laurel, 895 F.3d 317, 327 (4th Cir. 2018); Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 217 (4th Cir. 2016); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 253 (4th Cir. 2015); DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Boyer-Liberto, 786 F.3d at 281; Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); see also White, 548 U.S. 53, 67–70 (2006); Bonds v. Leavitt, 629 F.3d 369, 384 (4th Cir. 2011).

16

Title VII protects two kinds of activities: opposition and participation. See Netter v. Barnes, 908 F.3d 932, 937–38 (4th Cir. 2018); Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). "[O]ppositional activity must be directed to 'an unlawful employment practice' under Title VII . . . ." DeMasters, 796 F.3d at 417; see Netter, 908 F.3d at 937–38; Boyer-Liberto, 786 F.3d at 282; Laughlin, 149 F.3d at 259. The opposition clause applies when an employee "opposes not only employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful [under Title VII]." DeMasters, 796 F.3d at 417 (cleaned up); see Netter, 908 F.3d at 937–38; Boyer-Liberto, 786 F.3d at 282. The participation clause protects employees making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII. See 42 U.S.C. § 2000e-3(a); Laughlin, 149 F.3d at 259.

Under Title VII, material adversity "means [that an employer's actions] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." White, 548 U.S. at 68 (quotation omitted). Title VII does not redress "trivial harms" or provide a "general civility code for the American workplace." Id. (quotation omitted); see Oncale, 523 U.S. at 80. Rather, Title VII's anti-retaliation provision prohibits an employer's actions that "are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." White, 548 U.S. at 68 (quotation omitted); see Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997). The court analyzes material adversity from the perspective of an objective, reasonable employee and ignores "a plaintiff's unusual subjective feelings." White, 548 U.S. at 68–69; see also Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 134–35 (4th Cir. 2002). Additionally, the court must account for the "particular circumstances" surrounding the alleged retaliation. White, 548 U.S. at 69.

17

Title VII requires a plaintiff to prove that "the desire to retaliate was the but-for cause of the challenged employment action." Nassar, 570 U.S. at 352; see Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 900 (4th Cir. 2017); Guessous, 828 F.3d at 216–17; Huckelba v. Deering, No. 5:16-CV-247, 2016 WL 6082032, at *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "This but-for causation requirement is stricter than the lessened causation standard for discrimination claims, under which a plaintiff need only show that race, color, religion, sex, or national origin was a motivating factor for an adverse action by an employer." Netter, 908 F.3d at 938 (quotations omitted); see Foster, 787 F.3d at 249. This causation standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 570 U.S. at 360; see Guessous, 828 F.3d at 217. As such, "[n]aked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba, 2016 WL 6082032, at *3; McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585–86, 588 (4th Cir. 2015).

"To establish a causal relationship between the protected activity and the [adverse action], a plaintiff must show that the decision maker was aware of the protected activity at the time the alleged retaliation occurred." Roberts, 998 F.3d at 124. An employee cannot plausibly allege a but-for causal connection between protected activity and the employer's adverse action without alleging that the decisionmaker who took the adverse action knew that the employee had engaged in protected activity. See Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998), abrogated on other grounds by White, 548 U.S. 53; see also Conrad v. CSX Transp., Inc., 824 F.3d 103, 108 (4th Cir. 2016); Gestamp S.C., L.L.C. v. NLRB, 769 F.3d 254, 261–62 (4th Cir. 2014).

18

Courts consider temporal proximity between an employer's knowledge of protected activity and an adverse employment action. See, e.g., Breeden, 532 U.S. at 273–74; Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004), abrogated on other grounds by Nassar, 570 U.S. 338. An adverse action taken shortly after a decisionmaker learned of protected activity typically permits a reasonable inference of causation. See Dowe, 145 F.3d at 657. "A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, [however,] . . . negates any inference that a causal connection exists between the two." Id. (finding three years too long to infer causation); see Breeden, 532 U.S. at 274 (same for 20 months); Massaro, 95 F.4th 895 (4th Cir. 2024) (same for 18 months); Roberts, 998 F.3d at 126 (same for three months); Penley v. McDowell Cnty. Bd. of Ed., 876 F.3d 646, 656 (4th Cir. 2017) (same for eight and nine months); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (same for 13 months). A plaintiff can rebut this conclusion by plausibly alleging that her employer's actions taken during the intervening period demonstrate retaliatory animus. See Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007); King, 328 F.3d at 151 n.5.

Norris engaged in a protected activity by filing an EEOC charge on June 28, 2021. Even viewing the record in the light most favorable to Norris, however, Norris fails to raise a genuine issue of material fact concerning whether Fat Burgers failed to pay Norris her annual profit share in 2021 or 2022 because of her protected activity. See, e.g., White, 548 U.S. at 68. Rather, as discussed, Fat Burgers did not pay Norris an annual profit share in 2021 and 2022 because Fat Burgers had no profit to share. Thus, the court grants summary judgment to Fat Burgers on Norris's Title VII retaliation claim. See, e.g., id.; Dean, 2003 WL 21754998, at *8–9; Spriggs v. Pub. Serv. Comm'n of Md., 197 F. Supp. 2d 388, 395–98 (D. Md. 2002).

19

Norris alleges an IIED claim under North Carolina law against Fat Burgers and Uzzell. See Compl. ¶¶ 62–67. In analyzing this claim, the court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[2] A federal court, however, "should not create or expand [a] [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

An IIED claim requires "1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992); Turner v. Thomas, 369 N.C. 419, 427, 794 S.E.2d 439, 446 (2016); Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Conduct is extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

---

[2] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986) (quotation omitted); compare Chidnese v. Chidnese, 210 N.C. App. 299, 316, 708 S.E.2d 725, 738 (2011) ("[L]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.") (quotation omitted), with Clark v. Clark, 280 N.C. App. 384, 397, 867 S.E.2d 743, 754 (2021) (holding that harassing and stalking after a separation, scaring someone by stating "[w]e are going to continue doing everything in our power to make your life miserable," and posting advertisements and photographs online containing personal information presented "more than a scintilla of evidence of 'extreme and outrageous behavior'"), and Chapman ex rel. Chapman v. Byrd, 124 N.C. App. 13, 20, 475 S.E.2d 734, 739 (1996) (holding that repeating rumors that someone at the workplace had AIDS or was HIV positive and failing to investigate the truth and falsity of the alleged rumors before repeating them constituted extreme and outrageous behavior). Whether conduct is "extreme and outrageous" is a question of law for the court. Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

"Under North Carolina law, it is extremely rare to find conduct in the employment context that rises to the level of outrageousness necessary to support an IIED claim." Miller v. Gerber Collision (Ne.), Inc., No. 4:19-CV-18, 2019 WL 2527105, at *3 (E.D.N.C. June 19, 2019) (unpublished) (collecting cases); see Ortiz v. Vance Cnty. Sch., Admin. Unit, No. 5:18-CV-91, 2019 WL 1940596, at *9 (E.D.N.C. Apr. 30, 2019) (unpublished); Everett v. Redmon, No. 7:16-CV-323, 2017 WL 2313468, at *9 (E.D.N.C. May 26, 2017) (unpublished); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 340–41 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished); Efird v. Riley, 342 F. Supp. 2d 413, 427 (M.D.N.C. 2004); see, e.g., Hogan, 79 N.C. App. at 493–94, 340 S.E.2d at 122–23 (finding no extreme or outrageous conduct

where a supervisor screamed at employees, called them names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains). In cases where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, involving sexual advances, obscene language, and inappropriate touching. See Miller, 2019 WL 2527105, at *3; Moody-Williams v. LipoScience, 953 F. Supp. 2d 677, 683 (E.D.N.C. 2013); Payne v. Whole Foods Mkt. Grp., 812 F. Supp. 2d 705, 710 (E.D.N.C. 2011), aff'd, 471 F. App'x 186 (4th Cir. 2012) (per curiam) (unpublished); see, e.g., Guthrie v. Conroy, 152 N.C. App. 15, 22–23, 567 S.E.2d 403, 409–10 (2002) (collecting cases); Groves v. Travelers Ins. Co., 139 N.C. App. 795, 800–01, 535 S.E.2d 105, 107–09 (2000) (McGee, J., dissenting) (collecting cases), rev'd per curiam on reasoning of dissent, 354 N.C. 206, 552 S.E.2d 141 (2001); Hogan, 79 N.C. App. at 493, 340 S.E.2d at 123. Moreover, taking adverse action in violation "of federal law alone, does not necessarily constitute extreme and outrageous conduct under North Carolina law." Efird, 342 F. Supp. 2d at 427; see Bratcher, 545 F. Supp. 2d at 545; Pardasani v. Rack Room Shoes Inc., 912 F. Supp. 187, 192 (M.D.N.C. 1996) ("Plaintiff has alleged that he was given poor performance evaluations, not given promotions which were given to others, excluded from training and finally terminated from his employment. Assuming these allegation[s] to be true, these actions do not rise to the level sufficient to exceed all bounds usually tolerated by decent society.").

Severe emotional distress means "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Moreover, a plaintiff must produce "real evidence of severe emotional

22

distress." Pacheco v. Rogers & Breece, Inc., 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (2003) (emphasis added) (collecting cases); cf. McClean v. Duke Univ., 376 F. Supp. 3d 585, 613–14 (M.D.N.C. 2019) (holding plaintiff had stated a plausible IIED claim where plaintiff alleged she suffered from adjustment disorder, stress related peripheral nervous dysfunction, autoimmune flares, and suicidal ideation for which she received professional treatment); Radcliffe v. Avenel Homeowners Ass'n, Inc., 248 N.C. App. 541, 566 n.8, 789 S.E.2d 893, 910 n.8 (2016) (holding sufficient plaintiff's allegations she "is now disabled, in pain, suffers from post-traumatic stress disorder and major depression . . . and is unemployable in her field").

Norris alleges that Uzzell subjected her to "sexual harassment, stalking, and retaliation." Compl. ¶ 63. Norris alleges Fat Burgers "had knowledge of the material facts and circumstances surrounding" Uzzell's conduct and "ratified" Uzzell's behavior. Id. at ¶ 65. Defendants respond that Norris's evidence fails to reach "the heightened standard for workplace emotional distress" and that the alleged conduct is not extreme and outrageous as a matter of law. [D.E. 55] 29; see id. at 27–29; [D.E. 61] 10. Norris replies that the alleged sexual harassment under Title VII amounts to IIED under North Carolina law. See [D.E. 60] 13–15.

As for Norris's emotional distress, Norris testified she felt uncomfortable at work, feared being berated, and felt a loss of trust towards Uzzell and others. See [D.E. 57-1] 40. Norris cites no other evidence of emotional distress and continues to work at Fat Burgers.

Even viewing the record in the light most favorable to Norris, Norris has failed to create a genuine issue of material fact about whether she has a "disabling emotional or mental condition." Waddle, 331 N.C. at 83, 414 S.E.2d at 27; Pacheco, 157 N.C. App. at 450, 579 S.E.2d at 508. Thus, the court grants summary judgment to defendants on Norris's IIED claim. See, e.g., Fox-Kirk v. Hannon, 142 N.C. App. 267, 281, 542 S.E.2d 346, 356 (2001); Johnson v. Scott, 137 N.C.

23

App. 534, 539, 528 S.E.2d 402, 405 (2000). In light of this conclusion, the court does not decide whether defendants' alleged conduct was extreme and outrageous. Furthermore, the court rejects Norris's argument that creating a genuine issue of material fact concerning a sexually hostile work environment claim under Title VII equals creating a genuine issue of material fact concerning an IIED claim under North Carolina law. It does not. The elements are different. See, e.g., Moody-Williams, 953 F. Supp. 2d at 684 n.3; Guthrie, 152 N.C. App. at 20, 567 S.E.2d at 407–08 ("The elements and legal prerequisites" of an IIED claim are quite different from "a Title VII claim.").

## V.

### A.

Norris alleges defendants failed to pay her overtime in violation of the FLSA. See Compl. ¶¶ 68–77. Defendants disagree and argue that Norris was exempt from overtime because she was a manager during the relevant time period. See [D.E. 55] 11–16.

The FLSA's statute of limitations defines the relevant time period for Norris's FLSA claim. The general statute of limitations for the FLSA is two years. See 29 U.S.C. § 255(a); Desmond v. PGNI Charles Town Gaming, L.L.C., 630 F.3d 351, 357 (4th Cir. 2011). If an employer willfully violates the FLSA, the statute of limitations is three years. See id. Norris filed this action on August 13, 2022. See [D.E. 1]. Thus, the court assumes without deciding that the relevant time period for Norris's FLSA claim began on August 13, 2019.

The FLSA generally requires, in relevant part, that employers pay their employees at a rate equal to one-and-a-half times their standard hourly rate for every hour they work in excess of 40 during a given week. See 29 U.S.C. § 207(a)(1); Jean-Francois v. Smithfield Foods, Inc., No. 7:23-CV-63, 2023 WL 4424068, at *2 (E.D.N.C. July 10, 2023) (unpublished). The FLSA, however, classifies certain employees as exempt from the FLSA's overtime provisions. See, e.g.,

24

Emmons v. City of Chesapeake, 982 F.3d 245, 250 (4th Cir. 2020); 29 U.S.C. § 213(a). One of those exemptions is for an employee "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); see Emmons, 982 F.3d at 250; Desmond, 564 F.3d at 691; Shockley v. City of Newport News, 997 F.2d 18, 21 (4th Cir. 1993).

An employer must prove "by clear and convincing evidence" that an employee qualifies for one of the FLSA's exemptions. Shockley, 997 F.2d at 21; see Desmond, 564 F.3d at 691–92 & n.3.[3] "The question of how an employee spends [her] time is a question of fact, while the question of whether [her] activities fall within an exemption is a question of law." Hantz v. Prospect Mortg., LLC, 11 F. Supp. 3d 612, 619 (E.D. Va. 2014) (quotation omitted); Emmons, 982 F.3d at 250.

An "employee employed in a bona fide executive capacity" means any employee (1) who is compensated on a salary basis of at least $684 per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who "customarily and regularly directs the work of two or more other employees; and" (4) who "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion[,] or any other change of status of other employees are given particular weight." 29 C.F.R. §§ 541.100(a), 541.600 (2020); see Hairgrove v. City of Salisbury, No. 1:21-CV-814, 2023 WL 5985349, at *9 (M.D.N.C. Sept. 14, 2023) (unpublished).

Since August 15, 2018, Fat Burgers paid Norris a weekly salary of at least $700 per week.

---

[3] In Shockley, the Fourth Circuit discussed Department of Labor regulations in effect at the time. See Shockley, 997 F.2d at 21–25. Since Shockley, the Department of Labor has amended the regulations, including repealing the "short test." See, e.g., Desmond, 564 F.3d at 691 & n.2. The burden of proof, however, remains the same. See id. at 691–92, n.3.

Case 7:22-cv-00144-D-BM    Document 63    Filed 09/13/24    Page 25 of 32

See DSMF ¶¶ 14–16; PRSMF ¶¶ 14–16; [D.E. 57-4] 25. Moreover, during the relevant time period, Fat Burgers did not reduce Norris's weekly salary because of variations with the quantity or quality of Norris's work. See, e.g., [D.E. 57-2] 68; [D.E. 57-4] 18, 25; cf. 29 C.F.R. § 541.602(a). Accordingly, Norris meets the first prong of the FLSA's executive employee exemption.

As for the second, third, and fourth prongs, Norris does not dispute that she has been the front of house manager since 2018 and performs "some managerial duties." See [D.E. 57-1] 4; PRSMF ¶¶ 9–10; DSMF ¶¶ 9–10. Rather, Norris disputes whether her primary duty is management. See [D.E. 60] 3–4.

To qualify for the executive exemption, an "employee's 'primary duty' must be the performance of exempt work." 29 C.F.R. § 541.700(a). "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." Id. A court must determine an employee's primary duty "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id. "Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." Id. § 541.700(b). "Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." Id. "Time alone, however, is not the sole test, and nothing in this

26

section requires that exempt employees spend more than 50 percent of their time performing exempt work." Id. "Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." Id.

"[F]or example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register." Id. § 541.700(c). "However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement." Id.

The factors in 29 C.F.R. § 541.700(a) are "not exhaustive" in analyzing "the 'primary duty' requirement." Aguirre v. Joe Theismann's Rest., No. 1:19-CV-556, 2019 WL 12267460, at *6 (E.D. Va. Dec. 3, 2019) (unpublished) (cleaned up). Rather, the totality of the circumstances determines an employee's "primary duty." Id. "A court must consider them collectively to determine if the employer has satisfied the primary duty requirement." Id.

In assessing the relative importance of an employee's managerial tasks as compared to the employee's "non-managerial tasks, courts within the Fourth Circuit look to the significance of the management tasks to the success of the facility." Id. (collecting cases); see Jones v. Virginia Oil Co., 69 F. App'x 633, 638 (4th Cir. 2003) (per curiam) (unpublished) (holding that a Dairy Queen manager who spent approximately 80% of her time performing non-managerial tasks–such as working in the kitchen–was still exempt because the store "could not have operated successfully unless [she] performed her managerial functions."). Courts within the Fourth Circuit also consider

27

"a manager's training, evaluations, and factors affecting eligibility for bonuses and pay raises to determine the importance of an employee's exempt duties." Aguirre, 2019 WL 12267460, at *6 (cleaned up).

"Customarily and regularly" means "a frequency that must be greater than occasional but which . . . may be less than constant." 29 C.F.R. § 541.701. The phrase "does not include isolated or one-time tasks." Id.; see Hairgrove, 2023 WL 5985349, at *10.

Norris has been Fat Burgers' "front of house" manager since 2018. See [D.E. 57-1] 4; [D.E. 57-9] ¶ 9; [D.E. 57-3] 3; [D.E. 57-4] 19; [D.E. 57-7]; [D.E. 57-15] 21. As Fat Burgers' front of house manager, Norris is relatively free of direct supervision and Norris's job responsibilities include "training staff in following restaurant procedures and protocol, managing customer service and complaints, organizing employee schedules, keeping track of employee hours, ordering food and other restaurant supplies, supervising daily shift operations, assisting waitstaff where necessary, and coordinating front of house operations." See [D.E. 57-9] ¶ 10; [D.E. 57-1] 4 ("I do all the food ordering, all the beer ordering. I help with schedules. I work."); [D.E. 57-2] 66–68 (describing Norris's control over some employees' schedules); [D.E. 57-3] 3 ("Plaintiff[']s job responsibilities include managing front of house staff, training front of house staff and bartenders, and providing additional service support when the restaurant is understaffed."); [D.E. 57-4] 17–18. Norris also has some authority regarding Fat Burgers' hiring and firing decisions. See, e.g., [D.E. 57-2] 58–60, 75. Norris also performs some non-exempt work. See, e.g., [D.E. 57-3] 3.

Norris's non-exempt work does not render her job non-managerial. She only performs non-exempt work when the restaurant is understaffed, and she customarily and regularly serves as a manager. See, e.g., 29 C.F.R. § 541.700(c); Jones, 69 F. App'x at 638; In re Food Lion, Inc., 151 F.3d 1029, 1998 WL 322682, at *8–10 (4th Cir. 1998) (per curiam) (unpublished table

28

decision); Shockley, 997 F.2d at 25–26; Aguirre, 2019 WL 12267460, at *5–10. Even viewing the record in the light most favorable to Norris, Norris is exempt from the FLSA overtime provision under the executive exemption. See, e.g., Jones, 69 F. App'x at 638; In re Food Lion, Inc., 1998 WL 322682, at *8–10; Shockley, 997 F.2d at 25–26; Aguirre, 2019 WL 12267460, at *5–10.

In opposition to this conclusion, Norris contends she is not exempt because she received tips from Fat Burgers after becoming a manager. See [D.E. 60] 3–4; cf. 29 C.F.R. § 531.50(c) (prohibiting managers from keeping any portion of an employee's tips); 29 C.F.R. § 531.54(b) (prohibiting employees from requiring employees to share tips with managers). Norris also cites Greene's statement that Norris did "not work tipped shifts" when she trained new hires, but "has consistently earned, and been paid, tips on most of her shifts." [D.E. 57-7].

Fat Burgers paid Norris tips after she became a manager. See [D.E. 57-4] 22; [D.E. 57-2] 93. That Fat Burgers allowed Norris to receive her weekly salary and tips, however, does not mean that Norris was not paid on a salary basis under the executive exemption or convert her into a non-exempt employee. See, e.g., O'Brien v. Town of Agawam, 350 F.3d 279, 292–93 (1st Cir. 2003); Harris v. Wheatleigh Corp., No. 3:18-CV-30114, 2021 WL 3848147, at *4 (D. Mass. Aug. 27, 2021) (unpublished); Tomaz v. MAX Ultimate Food, Inc., No. 19-10533, 2020 WL 5517458, at *4 (D. Mass. Sept. 14, 2020) (unpublished). Rather, at most, it means that Fat Burgers paid Norris tips to which she may not have been entitled. See 29 C.F.R. §§ 531.50, 531.54.[4] Nonetheless, Norris received the same minimum required salary every week without any reduction on how well or how much work she worked. "The tips that [Norris] received were in addition to the

---

[4]  The record is not clear whether Fat Burgers had a tip pool during the relevant period or simply allowed each employee to keep tips that the employee received.

29

Case 7:22-cv-00144-D-BM   Document 63   Filed 09/13/24   Page 29 of 32

predetermined weekly amount, meaning that they would have no bearing on her status as an exempt employee." Harris, 2021 WL 3848147, at *4; O'Brien, 350 F.3d at 293; Tomaz, 2020 WL 5517458, at *4. Moreover, the FLSA permits an employer to "provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the arrangement also includes a guarantee of at least the minimum weekly required amount on the salary basis." 29 C.F.R. § 541.604; see, e.g., Kulish v. Rite Aid Corp., No. ELH-11-3179, 2012 WL 6532414, at *8 (D. Md. Dec. 13, 2012) (unpublished); McVay v. Mayflower Veh. Sys., Inc., No. 2:06-CV-533, 2008 WL 11429814, at *5 (S.D.W. Va. July 31, 2008) (unpublished).

Greene's statement does not help Norris. Rather, it merely demonstrates Norris performed some non-exempt tasks. That fact does not defeat the executive exemption. See, e.g., Jones, 69 F. App'x at 638; In re Food Lion, Inc., 1998 WL 322682, at * 8–10; Shockley, 997 F.2d at 25–26; Aguirre, 2019 WL 12267460, at *5–10; 29 C.F.R. § 541.700(c).

Even viewing the record in the light most favorable to Norris, Norris was an exempt executive employee during the relevant period. Accordingly, Norris was not entitled to overtime, and the court grants summary judgment to defendants on Norris's FLSA overtime claim.

## B.

Norris alleges that defendants retaliated against her in violation of the FLSA by not paying her tips after she engaged in protected activity on May 10, 2021. See Compl. ¶¶ 68–77; [D.E. 57-5]. The FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA], or has testified or is about to testify in any such proceeding." 29 U.S.C. § 215(a)(3). "The anti-retaliation provision facilitates the

enforcement of the FLSA's standards by fostering an environment in which employees' fear of economic retaliation will not cause them quietly to accept substandard conditions." Ball v. Memphis Bar-B-Q Co., 228 F.3d 360, 364 (4th Cir. 2000) (quotations omitted). To prove an FLSA retaliation claim, Norris "must show three elements: (i) that [s]he engaged in an activity protected by the FLSA; (ii) that [s]he suffered an adverse action by the employer subsequent to or contemporaneous with such protected activity; and (iii) that a causal connection exists between the employee's activity and the adverse action." Schmidt v. Bartech Grp., Inc., 119 F. Supp. 3d 374, 382 (E.D. Va. 2014) (quotation omitted); see Darveau v. Detecon, 515 F.3d 334, 341–42 (4th Cir. 2008); Walsh v. Lalaja, Inc., 565 F. Supp. 3d 766, 771 (E.D.N.C. 2021).

Norris engaged in protected activity under the FLSA on May 10, 2021. See [D.E. 57-5]. A genuine issue of material fact exists as to whether Fat Burgers failed to pay Norris tips for some period of time after May 10, 2021, because of her protected activity. See, e.g., [D.E. 57-1] 9, 34; [D.E. 57-2] 85–86, 93; [D.E. 57-4] 22–25. Accordingly, the court denies defendants' motion for summary judgment on Norris's FLSA retaliation claim. See, e.g., Lee v. Safeway, Inc., Civ. No. 13-3476, 2016 WL 3551828, at *3–5 (D. Md. June 30, 2016) (unpublished); Schmidt, 119 F. Supp. 3d at 383.

VI.

Norris alleges that defendants failed to pay her annual profit sharing in 2021 and 2022 and tips in 2021 and thereby violated the NCWHA. See Compl. ¶¶ 78–86. Specifically, Norris alleges Uzzell and Fat Burgers violated the NCWHA's "payday provision," which provides that "[e]very employer shall pay every employee all wages and tips accruing to the employee on the regular payday. Pay periods may be daily, weekly, bi-weekly, semi-monthly, or monthly. Wages based upon bonuses, commissions, or other forms of calculation may be paid as infrequently as annually

31

if prescribed in advance." N.C. Gen. Stat. § 95-25.6; Santos v. M.A.C. Grading Co., No. 7:19-CV-219, 2020 WL 12815229, at *3 (E.D.N.C. Aug. 27, 2020) (unpublished). If an employer fails to pay an employee in accordance with the payday provision, the employer is liable to the employee in the amount of the unpaid wages plus interest at the legal rate set forth in N.C. Gen. Stat. § 24-1 from the date each wage amount first came due. See N.C. Gen. Stat. § 95-25.22(a). "Wage" includes "commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments." N.C. Gen. Stat. § 95-25.2(16).

As discussed, Norris questions defendants' accounting of Fat Burgers' annual profits in 2021 and 2022. See [D.E. 60] 2–3; [D.E. 61] 1–3. Fat Burgers did not pay her annual share of the profits in 2021 or 2022 because there were no profits to share. Norris's speculation about profits in 2021 and 2022 cannot defeat summary judgment. Accordingly, the court grants summary judgment to defendants on Norris's NCWHA claim concerning her annual profit share in 2021 and 2022.

As for tips, a genuine issue of material fact exists concerning whether Fat Burgers failed to pay Norris tips due to her for some period of time after May 10, 2021. Thus, the court denies defendants' motion for summary judgment on Norris's NCWHA claim concerning tips.

VII.

In sum, the court GRANTS IN PART and DENIES IN PART defendants' motion for summary judgment [D.E. 54]. The parties SHALL engage in court-hosted mediation with United States Magistrate Judge Robert T. Numbers, II.

SO ORDERED. This 13 day of September, 2024.

JAMES C. DEVER III
United States District Judge

32